James A. Dumas (SBN 76284)
Christian T. Kim (SBN 231017)
Ann S. Chang (SBN 281116)
DUMAS & KIM, APC
3435 Wilshire Blvd., Ste. 990
Los Angeles, CA 90010

Telephone: 213/368-5000
Facsimile: 213/368-5009

Proposed Attorneys for Chapter 11 Debtor
and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>ANITSA, INC.,<br><br>　　　　Debtor and Debtor-in-Possession. | Case No. 2:20-bk-10168-BR<br><br>[Chapter 11]<br><br>**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER, PENDING A FINAL HEARING, AUTHORIZING DEBTOR TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363**<br><br>[DECLARATIONS OF GARO MINISSIAN CONCURRENTLY HEREWITH]<br><br>DATE: [To be determined]<br>TIME: [To be determined]<br>PLACE: Courtroom<br>　　　　255 East Temple Street<br>　　　　Los Angeles, CA 90012 |

　　　　Anitsa, Inc. ("Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy cases (the "Chapter 11 Cases"), hereby files this motion (the "Motion"), on an emergency basis, for the entry of an order authorizing Debtor to use cash collateral in an amount not to exceed $270,000.

The debtor is seeking the use of cash collateral in connection with a simultaneously filed motion for debtor-in-possession financing which contemplates an immediate loan of $220,000 form Active Capital Company ("ACC") to fund the debtor's operations from January 10 through some day in the week of January 13 where a further hearing can be held with respect both to the DIP loan and the within request to use cash collateral. During this period the debtor would only use cash collateral to pay to meet the January 10 payroll which is estimated to cost $220,000 and to make necessary expenditures for fuel, utilities, and insurance, not to exceed $50,000.

## BACKGROUND

Debtor and debtor-in-possession, Anitsa, Inc. ("Debtor") is a company that provides valet laundry services to the hospitality industry. It is one of the four largest such companies in the Los Angeles area. It operates out of one facility located at 6032 Shull Street in Bell Gardens. It had gross revenues of $10,943,461 in 2018. If you add back in depreciation of $780,000, it eked out a profit of $150,284 in that year, in spite of paying $667,421 in interest to various lenders. Through September 30, 2019 revenues were $7,323,030.44. Net income, taking into account depreciation and interest, was a loss of $347,508. Financials for the last quarter of 2019 and the first week of 2020 are not yet completed. However, it would appear that revenues for the year are down approximately $2 million and the company has sustained an operating loss of as much as a half million dollars. Accounts payable through September were $1,205,324 (as opposed to $809,227 at the end of 2018), and long-term debt, the company's biggest problem and the source of its large interest expense, was $4,794,514 (inclusive of the current portion of that debt)

There is a blanket security interest in substantially all of the company's assets in favor of American Riviera Bank (formerly known as Bank of Santa Barbara) which is currently owed approximately $3.3 million. The bank's security interest was the subject of a UCC-1 which was recorded on January 31, 2012 which was followed by four other UCC-1 filings through April 16,

2013. The bank recorded five more UCC-1's in 2015. Although there are numerous other UCC-1 filings by several other parties, all these other parties are junior to America Riviera Bank and/or they do not have security interests in cash collateral. See, generally, Request for Judicial Notice. The bank's loan was obtained through the Small Business Administration and is personally guaranteed by the debtor's principal, Garo Minassian. The receivables of the company have all been factored and the debtor has less than $10,000 in its operating account at American Riviera Bank. A DIP account at Bank of America is in the process of being established. (This motion is being filed the day of the bankruptcy filing.)

The bank obtained an appraisal of what a forced liquidation sale of the debtor's equipment, furniture, and vehicles would yield which showed a figure of $931,682. However, the amount does not take into account the expenses of such a sale and the debtor also believes that the figure is high. After taking these factors into account, the debtor believes that a forced sale would yield less than $500,000. Obviously, if the bank isn't made whole, there will be nothing for general unsecured creditors.

Notwithstanding the company's recent losses, it has going concern value for a well-funded strategic buyer wanting to enter the Los Angeles hospitality laundry business, so long as the buyer can acquire the assets free and clear of the liabilities. Such a buyer would have a premises, equipment and vehicles already in place, a trained work force of 152 employees already on the job, and a book of clients. Sporadically over the last year and intensively over the last several weeks, the debtor has been looking for such a buyer in the hope of at least paying down more of the SBA loan than could obtained from a mere forced liquidation of the equipment and vehicles, and finding a new employer for its employees and a new tenant for its landlord. In the course of this search, it has been imperative that there be no interruption in the debtor's service to its clients which in turn has meant that the debtor has needed to cover essential expenses such as vehicle fuel, utilities, and, most

critically, payroll.

The debtor was unable to reimburse its payroll provider, ADP, for its last payroll and it is currently without funds to pay its next payroll which is due on Friday, January 10. It nonetheless has kept the business open because over the last two weeks it has been in discussions with a strategic buyer by the name of Active Capital Company ("ACC"). ACC specializes in investing in companies for the purpose of introducing state-of-the-art technologies and systems. It has had a particular focus on the laundry business and a major investment in one of the largest laundry businesses in the Netherlands and Belgium. It has a relationship with Vega Systems, one of the leading industrial laundry equipment manufacturers with which it wants to work to acquire and modernize an industrial laundry in the United States.

Dick Zeldenthuis, a partner in ACC, and other members of his team came to Los Angeles on Sunday, January 5 and in a series of meetings on January 5, 6, and 7 representatives of the debtor and ACC have been in discussions about a purchase agreement. The parties also met with the debtor's landlord, Kerbel, LLC, which is currently owed $266,650 in accrued rent. These discussions resulted in a non-binding offer transmitted at 4:54 p.m. on January 7 for the purchase of the assets of the debtor, free and clear of its liabilities. This was then superseded by a new offer transmitted at 12:14 p.m. January 8, and attached as Exhibit D to the Minassian Declaration, under the terms of which ACC proposes to pay $1.1 million for the assets. This would be inclusive of loans that ACC would make to maintain the operations of the business pending approval of the sale and whatever it will take to assume and reject the lease and any other critical executory contracts, such as equipment leases. In particular, it is conditional upon an assumption and assignment of the lease to Kerbel (something that Kerbel has not yet agreed to). It contemplates a division of the sales proceeds between the American Riviera Bank and Kerbel, with a carve-out for general unsecured creditors.

The debtor filed the within petition at 1:28 p.m. on January 8, 2020. The ACC offer must be accepted by January 9 and the sale must close no later than February 14. It is the debtor's desire to accept the offer and to have a hearing for approval of the sale at the earliest possible time. However, a sale hearing obviously cannot be held before the payroll that is due on January 10. As such, it will be necessary for the debtor to cover the January 10 payroll or the premise of the transaction – the continuity of the debtor's business – will have been lost. The transaction will be lost, the employees will not receive their paychecks, the landlord will not receive its rent, and the bank will be relegated to being repaid from whatever it can get from an eventual auction of the equipment, furniture, and vehicles.

The within motion is accompanied by a motion for authority to obtain the DIP financing. Granting of the DIP financing and the authority to use cash collateral carries little, if any risk, for American Riviera Bank, let alone parties junior to the bank. The debtor has minimal cash collateral at the moment because all of its receivables have been factored. The continued operations will generate receivables which will not be factored, and which are likely to exceed the amount of the DIP financing.

If the DIP motion is denied, the debtor will simply cease operations and there will be no need to use cash collateral. If the motion is granted, the cash collateral that will initially be used will have been created exclusively by the source of the DIP financing, ACC, and be covered by its newly created lien. ACC obviously is consenting to use of cash collateral. The debtor is requesting a further hearing during the week of January 13 at which time the Court can set a hearing date on the sale motion and determine whether additional funds will have to be advanced pending that hearing. By that time, the debtor will have generated receivables but, because of the terms of payment of its customers, is unlikely to have bank deposits that will exceed the balance of the DIP financing. In any event, at this second hearing the Court can re-address the issue of whether there should be any

restrictions on the use of cash collateral, or it can obviously prohibit further use altogether. Also, by the time of the second such hearing the debtor, ACC, the bank, Kerbel, and other interested parties will have had time to consider and discuss the proposed sale and hopefully this will result in a cooperative approach to this urgent matter.

All UCC-1's recorded against the debtor are attached in chronological order in the debtor's Request for Judicial Notice.

### PROPOSED USE OF CASH COLLATERAL

Debtor requires the use of cash collateral to pay for the costs of maintaining business operations, preserving the going-concern value of its business, and the costs of administration of the Debtor's chapter 11 case. Debtor also seeks to use cash collateral to pay for insurance premiums, fuel for its vehicles, utilities, and employee wages.

### MATERIAL TERMS REGARDING THE USE OF CASH COLLATERAL

The material terms and provisions of the Debtor's proposed use of cash collateral are as follows:

1. <u>Use of Cash Collateral</u>: The Debtor will use cash collateral to fund payroll and pay utilities and other necessary expenses for the operation of its business. Prior to the final hearing on the cash collateral motion, the Debtor will submit a more detailed budget.

2. <u>Deposits of Cash Collateral</u>: Debtor will deposit all cash collateral into the debtor-in-possession account ("DIP Account") which it is opening with Bank of America, in accordance with the U.S. Trustee Guidelines and Requirements for Chapter 11 Debtors-in-Possession promptly upon receipt.

3. <u>Budget</u>: Debtor will use the cash collateral to fund the payroll which will be approximately $220,000 and, pending a second hearing, to pay utilities, fuel, and insurance in such amounts as shall not exceed $50,000 until the second hearing but which are expected to be

substantially less. A more detailed budget will be provided in advance of a second hearing.

4.  <u>Adequate Protection</u>: American Riviera Bank will be adequately protected because in the absence of the use of cash collateral, there will be no more than minimal cash collateral. All pre-petition receivables were factored and there is less than $10,000 in the debtor's operating account. In the absence of the use of cash collateral, the bank would be relegated to collateral consisting of equipment, furniture, and vehicles to be sold at auction. Since the initial order sought contemplates use of cash collateral for less than a week, there is virtually no risk that the bank's position with respect to this physical collateral will be compromised by granting a blanket security interest to ACC. For its part, ACC is clearly consenting to the use of the cash collateral that will be created by its funding of the ongoing operations of the business.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   STATEMENT OF FACTS

Debtor and debtor-in-possession, Anitsa, Inc. ("Debtor") is a company that provides valet laundry services to the hospitality industry. Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on January 7, 2020 (the "Petition Date"). Debtor continues to operate the business, maintain control and possession of its assets, and has the rights, powers, and duties of debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### II.   DEBTOR SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

Debtor should be authorized to use cash collateral to continue its operation, maintain and preserve its assets according to its budget. The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code. Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice

or a hearing.

11 U.S.C. § 363(c)(1). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363. 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]" 11 U.S.C. § 363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if: "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section." 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); *In re Oak Glen RVee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

Debtor will not be able to continue to operate its business or preserve the value of its assets unless it can use the cash collateral to pay its projected expenses according to the budget. Debtor's inability to pay those expenses will cause immediate and irreparable harm to the debtor's bankruptcy estate. Debtor's inability to pay its payroll, utilities, and other basic operating expenses would cause shutdown of its business and decimate the value (going-concern or otherwise) of the Debtor's

business and assets. The maintenance of the Debtor's business and preservation of its assets are critical for consummation of the intended sale of Debtor's business and assets as going-concern free and clear of liability that will maximize value and provide for recoveries to creditors in this case.

[Debtor believes that its secured creditors all consent to the use of cash collateral and/or are adequately protected by the continued operation of the Debtor's business and other forms of adequate protection.] Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988) ("McCombs").

Furthermore, the Debtors submit that the value of the Prepetition Secured Parties' interest in the Debtor's Cash Collateral will be adequately protected by, among other things, the maintenance and continued operation of the Debtor's business. Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim. 108 S.Ct. at 630. *See also, McCombs,* 88 B.R. at 266. Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." *McCombs*, 88 B.R. at 266. The law is clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988). *See also In re Stein,* 19 B.R. 458 (Bankr. E.D.Pa. 1982). The Stein Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the

debtor's business. *See also, In re McCombs, supra,* where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

The payment of the expenses necessary for the Debtor to maintain and continue operating their businesses will adequately protect the Prepetition Secured Parties because by doing so, the Debtor will be able to preserve the going-concern value of the Debtor's business and assets for the intended sale thereof. Other Courts have determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership,* 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco,* 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.,* 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor, supra,* the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of Cash Collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors. As discussed above, the Debtor has an offer

for the purchase of its business and assets as a going-concern. The use of cash collateral in maintain and preserving Debtor's business operates and value of its assets is critical to effectuate the sale. If the Debtor is not permitted to use Cash Collateral to maintain its business operations and to preserve the value of its assets, the chances of successfully selling the business and assets will evaporate, and the value of the Debtor's assets will be dramatically and negatively impacted. On the other hand, if the Debtor is authorized to use the Cash Collateral, the Debtor will be able to maintain its business operations and preserve the value of its assets for the successful consummation of a transaction which ultimately provides for a recovery to all creditors. The use of Cash Collateral will therefore only enhance the prospect of the Debtor's reorganization.

The Debtors submits that the requirements of 11 U.S.C. § 363(c)(2) have been satisfied and that the Debtor should be authorized to use the Cash Collateral.

### III. CONCLUSION

Based on the foregoing, the Motion should be granted.

Dated: January 8, 2020

DUMAS & KIM, APC

By: _____
James A. Dumas, Proposed Attorneys for Debtor and Debtor-in-Possession, Anitsa, Inc.

| In re: Anitsa | CHAPTER: 7 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:20-bk-10168-BR |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 3435 Wilshire Blvd., Ste. 990, Los Angeles, CA 90010.

A true and correct copy of the foregoing document entitled (*specify*): **Debtor's Emergency Motion for Entry of an Interim Order, Pending a Final Hearing, Authorizing Debtor to Use Cash Collateral Pursuant to 11 U.S.C. §363** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **January 8, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

James A Dumas    jdumas@dumas-law.com, jdumas@ecf.inforuptcy.com
John-Patrick M Fritz    jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com
David B Golubchik    dbg@lnbyb.com, stephanie@lnbyb.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
Larry D Webb    Webblaw@gmail.com, larry@webblaw.onmicrosoft.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **January 8, 2020**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **January 8, 2020**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

United States Bankruptcy Court
Central District of California Honorable Barry Russell
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 8, 2020 | Danielle M. Landeros | /s/ Danielle M. Landeros |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012    F 9013-3.1.PROOF.SERVICE